On the Merits.
Plaintiffs sued on an alleged verbal agreement between James Bradshaw and Chester F. Knoll, acting for himself and as representative of James L. Knoll, Miss Ruth Knoll, and Miss Anna Knoll, owners of the plantation known as “Ellen Kay” and “Shirley,” situated in the parish of Avoyelles, for the purpose of incorporating the interests of said owners in said property. The petition alleged that the said Bradshaw under said agreement was- to assist said Chester F. Kn'oll in perfecting' said organization in the following manner: A corporation was to be organized with said Knoll as president and said Bradshaw as secretary-treasurer, with a capital stock of $250,000 to be paid for by the transfer of said plantations to the corporation; that a bond issue of $75,000 was to be placed upon said property for the purpose of retiring existing mortgages and erecting a sugar mill; that Bradshaw was to secure purchases for $70,000 worth of said bonds, and that he was to receive, as compensation for all of said services, $5,000 in bonds and 200 shares of the capital stock of a par value of $20,000 in addition to all the expenses he might incur in perfecting said plans; that in December, 1909, the original plans were altered to the extent of increasing the bond issue from $70,000 to $125,000 for the purpose of purchasing a mill from the Poydras Planting & Manufacturing Company for the price of $56,000, of which $50,-000 was to be paid for in the bonds of the company; that the C. F. Knoll Planting Company was incorporated on March 7, 1910, and on March 18, 1910, the said plantations were transferred to said company, and the said owners received all the shares of stock, except eight shares held nominally by the other incorporators; that on March 29, 1910, the board of directors by resolution authorized Chester F. Knoll, president, and James Bradshaw, one of the directors, and also secretary-treasurer, to enter into a contract with the Hibernia Bank & Trust Company to act as trustee for the issue of said bonds: that Bradshaw made the negotiations with the trust officer of the said bank, and on April 15th an agreement to act as trustee was entered into.
The petition further alleged that on April 15, 1910, an act of mortgage was executed by the defendant company in favor of said bank for $125,000, represented by bonds of $1,000 denominations, all as originally planned and executed by the said Bradshaw; that said issue of bonds having been made on April 15, 1910, Bradshaw resumed the work of negotiating said bonds, and was so engaged when on April 24, 1910, he received a letter of daté April 21, 1910, signed by Knoll, as president, and also individually, in, which he was notified that after April 25, 1910, the writer would consider that Bradshaw or nis firm of John S. Lowry & Co. had no further connection with the bond issue.
The petition further alleged that, by reason of said summary dismissal of said Bradshaw from his said employment, the defendants were liable in solido for the compensation agreed upon for his services, namely, $5,000 in bonds- and 200 shares of the original stock of said corporation, or their equivalent in money, namely $25,000, in the event of their failure to make delivery; or if the court should hold that the said Knoll is alone liable for the payment of stock agreed upon, out of the issue to him, then that the defendants are still liable in solido for the $5,000 in bonds.
The petition further alleged that Bradshaw, in executing said agreement, expended *836 of Ms private funds the amount of $1',910 as per bill annexed, to which petitioners are entitled under said agreement.
The claims for damages ex delicto seem to have been disregarded in the judgment below and are not urged in this court.
Knoll in his answer averred that in the fall of 1909, upon Bradshaw representing that he could raise sufficient cash by the sale of bonds to be issued to cover all the expenses of erecting and operating a first-class sugar refinery in time to take off the cane crop of 1910, he agreed that if Bradshaw could sell sufficient bonds .for cash, to the amount of $125,000 in time for said purposes, he would receive as a compensation $5,000, payable in bonds, or its equivalent in cash, and would be elected secretary-treasurer of the company at a salary of $125 per month. Respondent further averred that the said Bradshaw drafted the charter, took active charge and exclusive supervision of the issuance and printing of the bonds, and visited St. Louis, Ohieago, and other cities with a view of disposing of said bonds, and associated with him in the enterprise one John S. Lowry, forming a partnership under the name and style of John S. Lowry & Co. Knoll further averred that in January, 1910, he was informed by Bradshaw and Lowry that there were some objectionable features in the charter, and upon their advice and suggestion a new charter was drafted and published, and new bonds were issued; and that said parties represented that, as soon as the new charter was executed, the bonds could be sold immediately. Knoll further averred that, relying upon' these representations, he waited until some time in the month of April, 1910. when he notified said parties that he could not delay the sale of the bonds later than April 25, 1910, and that they then and there agreed to abrogate the agreement for the compensation, if the bonds were not sold by said date. Knoll further averred that said parties continued to default, and that he was forced at a great sacrifice to raise the necessary funds from other sources. Knoll specially denied that he agreed to pay Bradshaw or Lowry any expenses incurred in their efforts to dispose of said bonds, but that the said Bradshaw, by misrepresentations, procured from him an amount exceeding $6,000, which respondent claimed in re-convention.
In his testimony Knoll admitted that, in the event of success in the sale of the bonds, Bradshaw was to receive $20,000 in stock of the corporation.
It is an undisputed fact that Bradshaw never sold any bonds of the company, and never found a purchaser willing to take any of them. Lowry admitted the inability of Bradshaw and himself to find a market for the bonds, and in the name of their firm abandoned the venture, after losing $4,000 in the enterprise. Lowry testified that Bradshaw consented to the proposed time limit of April 25, 1910.
Knoll testified to the averments contained in his answer, and further that Bradshaw often admitted Ms inability to dispose of the bonds, and spoke of ending troubles by jumping into the river. Mr. J. D. Hill, a prominent lawyer and business man of the city of New Orleans, testified as a witness in the case.
His testimony is substantially as follows: On December 10, 1909, Mr. Hill, as president of the Poydras Planting Company agreed to sell to Mr. C. F. Knoll a complete sugar house outfit for the price of $56,000. At a conference at which Bradshaw and Lowry were present, the latter said that:
“It was certain as anything human could be that he would be able to secure for Mr. O. F. Knoll and pay over to him, through some insurance company (name not mentioned), in 30-days, $25,000, in 60 days, $25,000, in 90 days, $25,000, taking therefor $75,000 first mortgage' bonds of an issue of $125,000. The other $50,-000 bonds to be pledged to secure the deferred *838 payments on the sale of the machinery, etc., of the Poydras Planting & Manufacturing Company at $56,000.”
Under this arrangement the Poydras Company was to receive $1S,666.66 in cash, and balance on terms. Bradshaw and Lowry failed to sell the bonds to the insurance company or any one else, and in April, 1910, Mr. Knoll notified them that he could not wait on them beyond the 25th of that month. When it became certain that Bradshaw and Lowry could not dispose of the bonds, Mr. 1-Iill financed the building of the mill on the Knoll plantation and put the enterprise in a position where the bonds could be placed to a certain extent, and advised the Poydras Company to finally take $50,000 of the bonds which had been pledged to secure part payment of the price of $56,000, and this transaction was afterwards confirmed by the Knoll Planting & Manufacturing Company. Mr. 1-Iill prepared the second charter, and in every way he could assisted Bradshaw and Lowry in-, their efforts to dispose of the bonds.' Mr. 1-Iill was interested in their success, as the Poydras Company was expecting to be paid out of the proceeds of the bond issue. Mr. Hill, as late as May 4,. 1910, offered to waive the vendor’s lien on the machinery in favor of any purchaser of the bonds. The first charter prepared by Bradshaw was found to be defective and impracticable because the work was supposed to be done on January 15, 1910, so it was necessary to fix another date, which was in April of the same year. Bradshaw knew all about that, being himself almost daily in Mr. Hill’s office. There was no resolution of the board of directors, or any authorization given on their part or any one else to enter into any contract with James Bradshaw for any commission for any work that he did. In all of Bradshaw’s many conferences and interviews with Mr. I-Iill from December 21, 1909, to July, 1910, there was no pretense on Bradshaw’s part that he had a claim against the C. P. Knoll Planting & Manufacturing Company in which Mr. JEHU became interested after its reorganization. Mr. Hill’s statements are corroborated in most particulars by documentary evidence found, in the transcript.
A letter from Bradshaw to Knoll of date January 29, 1910, written in St. Louis, contains'a recital of the failures’of Lowry and himself to find a market for the bonds of the defendant company. In the concluding portion, the writer says:
“I know the desperate conditions at your end now, and know exactly how much every minute’s delay means to you and how much you will worry over it. I beg of you, however, if it is possible to do so, to indulge the situation a few days longer, as I expect to stay right on the_ job until the entire matter is fixed to your satisfaction, * * * and will ask you to please remain as passive as possible and try to recuperate your health so that you may put all the force you have into it. as soon as the matter is accomplished, which must be done in a few days.”
Bradshaw’s letter shows that he considered that the time limit was about to expire, and that performance on his part must take place within a few days. Bradshaw was accorded indulgence after indulgence, and Knoll was finally compelled to demand performance on or before April 25, 1910. Bradshaw had more than a reasonable time to perform his contract, but utterly failed to do so.
Plaintiffs have not appealed from the judgment in favor of O. F. Knoll, which decreed that they were indebted unto Knoll in the sum of $6,000 for advances made to Bradshaw, and, in effect, dismissed all their demands against him. Knoll has not appealed from that portion of the judgment which deducts said amount of $6,000 from the award of $20,000 against the defendant company.
[3] The only question before us is whether said corporation is indebted unto the plaintiffs under the agreement of October, 1900, *840 between Knoll and Bradshaw. It is not shown that the said company ratified or adopted said agreement by resolution or other corporate action, or has received any benefit from the alleged services of Bradshaw.
“It is impossible to imagine how the defendant, a judicial person, incurred a debt before the existence.” Marchand v. Loan & Pledge Association, 26 La. Ann. 389.
“The president of a corporation has not by virtue of his office the power to bind the corporation or control' its property. His power as agent must be delegated directly in the organic law of the corporation or through the board of directors.” Jeanerette Rice Milling Co. v. Durocher, 123 La. 160, 48 South. 780. “The corporation is not bound by the contracts of its promoters.” Cook on Corporations (4th Ed.) | 707, and notes; 10 Cyc. p. 264.
We can perceive no grounds, legal or equitable, for affirming the judgment against the defendant company.
It is therefore ordered that the judgment rendered against the C. E. Knoll Planting & Manufacturing Company in the court below be annulled, avoided, and reversed-, and it is now -ordered and decreed that plaintiffs’ suit against said company be dismissed, with costs in both courts.
PROVOSTY, J., takes, no part, not having heard the argument.